*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* THORNTON, Minors.

UNPUBLISHED
June 16, 2022

No. 358111
Ingham Circuit Court
Family Division
LC Nos. 17-000696-NA
              17-000697-NA
              17-000698-NA

Before: GLEICHER, C.J., and SAWYER and GARRETT, JJ.

PER CURIAM.

The circuit court terminated the parental rights of the respondent parents to three of their four children after they failed to benefit from more than four years of intensive services. The Department of Health and Human Services (DHHS) made significant efforts to reunify this family and the circuit court did not err in finding statutory grounds for termination and determining that termination was in the children's best interests. We affirm.

## I. BACKGROUND

Respondents have lived together for several years and share four children—MT1, LT, MT2, and AT. In March 2017, Children's Protective Services (CPS) investigated a complaint about respondents' only school-aged child—MT1—who is autistic and nonverbal. The school reported that MT1 had attended only a third of the school days so far that year, was filthy and malnourished, and had chronic lice issues. CPS workers conducted a home study and found respondents' residence in an extremely unsanitary condition.

CPS did not immediately take the children into care, instead providing intensive in-home services to the family. Workers helped respondents clean the home and secure new, clean bedding and clothes for the children. But respondents made little progress. Accordingly, the DHHS took the children into care on April 21, 2017. The children were returned to their parents' home three months later. The court ordered the family to participate in the Intensive Neglect Services (INS) program, which is designed to provide intensive, enhanced services to at-risk families. Similar to a DHHS case service plan, respondents were ordered to participate in a multitude of services

-1-

designed to remove the barriers to reunification. Even with this intensive program in place, respondents could not manage the children's needs and maintain any level of cleanliness in the home. During a surprise visit on October 13, 2017, the caseworker found the home filthy and infested with flies and cockroaches. Feces were smeared on the bedding and filled the home's only toilet. The worker observed empty alcohol bottles and found marijuana in reach of the children. Respondent-father was intoxicated and was not adequately supervising the children. As a result, the children were taken back into care.

Respondents continued to participate in intensive services. However, respondent-father was incarcerated for five months for a probation violation. The children eventually returned to respondents' care in December 2018, again with intensive in-home services. Respondents continued to have difficulty getting the children to school on time, if at all. In November 2019, the caseworker again found the home in a deplorable condition and observed that the children were dirty and smelled of urine. Respondents had stopped an in-home therapy program for MT1. Moreover, respondents had recently tested positive for cocaine and Benzoylecgonine. The children were taken into care a third time. Even then, reunification was the DHHS's goal.

In the months that followed, respondent-mother missed several drug screens, and respondent-father tested positive for cocaine three times. Respondents voluntarily reduced their parenting time of their three youngest children from twice weekly to once. They submitted to psychological evaluations, revealing that both are easily overwhelmed and that respondent-mother fell into the borderline to low average intelligence range. The psychologist recommended that parenting time remain supervised. However, the pandemic created a lack of childcare options and respondents began providing unsupervised daycare for MT1.

By February 2021, the caseworker again expressed concerns about the cleanliness of respondents' home. The children had contracted lice while visiting their parents. Then, in March 2021, respondent-father allegedly threw a paint can at the rear window of his ex-girlfriend's car, shattering the window, with the woman's child inside. The incident occurred outside respondents' apartment, and respondent-mother allegedly came out holding a gun. Respondents denied these events, but paint splatters corroborated the accuser's story.

The DHHS responded by filing a supplemental petition to terminate respondents' parental rights to LT, MT2, and AT. The DHHS did not seek termination of respondents' rights to MT1 as her special needs had made it difficult to find a suitable, long-term placement. The court ultimately found termination as to the younger children supported under MCL 712A.19b(3)(c)(*i*), (g), and (j), and determined that termination was in the children's best interests.

## II. REASONABLE EFFORTS

Respondents contend that the DHHS failed to make reasonable effort to reunify them with their children. We review for clear error a trial court's finding that "reasonable efforts were made to preserve and reunify the family." *In re Fried*, 266 Mich App 535, 542-543; 702 NW2d 192 (2005). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013)

(cleaned up). "Clear error signifies a decision that strikes us as more than just maybe or probably wrong." *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286 (2009).

Before a court may contemplate termination of a parent's rights, the DHHS must make reasonable efforts to reunite the family. MCL 712A.19a(2). "The adequacy of the [DHHS]'s efforts to provide services may bear on whether there is sufficient evidence to terminate a parent's rights." *In re Rood*, 483 Mich 73, 89; 763 NW2d 587 (2009). And when the proceedings involve a parent with special needs more is required of the DHHS. The Americans with Disabilities Act (ADA), 42 USC 12101 *et seq.*, requires the DHHS to reasonably accommodate a disabled parent when providing services directed at removing the barriers to reunification. *In re Terry*, 240 Mich App 14, 24-25; 610 NW2d 563 (2000). Under both the ADA and the Michigan Probate Code, the DHHS is required to reasonably modify its services and programs to accommodate the needs of a disabled parent. *In re Hicks/Brown*, 500 Mich 79, 86; 893 NW2d 637 (2017).

Respondents challenge DHHS's efforts on two fronts. First, they argue that the services provided did not accommodate respondent-mother's intellectual disabilities. Second, they assert that DHHS did not refer them to all the necessary services available. Specifically, respondents assert that they should have been offered domestic-violence counseling and services that were offered to MT1's foster parent. However, the record demonstrates that the DHHS referred respondents to all appropriate services and made extraordinary efforts to reasonably accommodate respondent-mother's intellectual deficits.

The DHHS, CPS, and INS provided intensive services to respondents for more than four years, even before these proceedings began. Workers came into respondents' home and provided hands-on services to assist them in cleaning their home, improving their parenting skills, addressing their substance use issues, and meeting the educational, medical, and physical needs of their children. Foster care supportive visitation coaches assisted respondents for several months. Therapists specializing in families with autistic children provided in-home family therapy services. Respondents participated in programs offered by Families First and Families Together Building Solutions. They also had the benefit of foster care case management, Family Team Meetings, psychological evaluations, parent support groups, random drug screens, parenting classes, referrals to Community Mental Health, and individual counseling. Respondents were provided cleaning supplies and Families First workers actually helped them clean their own home.

Respondents were given an inordinate amount of time to benefit from these intensive services. While most child protective proceedings last two years, respondents had four. The children were returned to respondents' care on three occasions to allow them to demonstrate benefit from the services provided. Ultimately, respondents could not retain and implement the information that was provided to them over the many years their children were wards of the court.

These services reasonably accommodated respondent-mother's intellectual limitations. It should be noted that the psychologist described respondent-mother as falling at the low end of average intelligence; there was no significant deficit. Even so, respondents were provided intensive services with an extremely high level of personal assistance, services not often provided to families. They were also given double the amount of time normally allotted to parents to demonstrate a benefit from services. We fail to see how more intensive, modified services could have been provided.

While respondents challenge the DHHS's failure to provide certain daycare and respite care services to them that it provided to MT1's foster mother, they fail to recognize that they did not need these services. MT1's foster mother worked outside the home and could not have taken custody of MT1 without these services. Indeed, the DHHS offered these services to ensure the foster mother would continue providing a home for MT1. This was necessary because MT1 exhibited extremely challenging behaviors, had already been through three foster homes, and was in danger of being placed in a residential facility if her final foster placement did not work out. While respondents claimed to work fulltime outside of the home, neither ever presented any pay stubs. Moreover, it appeared that both respondents remained home to care for the children, although neither provided adequate supervision while the children were in their care.

Respondents also contend that after the March 2, 2021 incident, the DHHS should have offered domestic-violence counseling instead of pursuing termination. However, the altercation between respondents and the father's ex-girlfriend was not the heart of the decision to seek termination; it was simply the straw that broke the camel's back. Respondents received a lengthy course of extremely intensive services and exhibited little to no benefit. Adding yet another service to address this singular event could have no impact on the proceedings.

### III. STATUTORY GROUNDS

Respondents also challenge the statutory grounds underlying the court's termination decision. Pursuant to MCL 712A.19b(3), a circuit court "may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence" that at least one statutory ground has been proven by the DHHS. MCR 3.977(A)(3); *In re Trejo*, 462 Mich 341, 350; 612 NW2d 407 (2000). The court's termination decision followed the filing of a supplemental petition. When termination is sought in a supplemental petition based on new grounds, the DHHS must present legally admissible evidence in support. *In re DMK*, 289 Mich App 246, 258; 796 NW2d 129 (2010). We review for clear error a circuit court's factual finding that a statutory termination ground has been established. *Rood*, 483 Mich at 90-91.

The court terminated respondents' parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (j), which provide:

> The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:

> \* \* \*

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

> \* \* \*

-4-

(g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

* * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

The circumstances that led to the adjudication included the deplorable condition of the home, poor parenting skills, failure to meet the children's educational, medical, and physical needs, and substance abuse. These same circumstances supported that respondents had not provided proper care and custody for their children and that the children would be at risk if returned to their parents' home yet again.

Respondents were offered a treatment plan designed to address the barriers to reunification. The services were intensive, hands-on, and frequently home-based. Despite these efforts, the circumstances that precipitated the children's removal continued to exist. Every time respondents made some progress, they then significantly regressed. Once cleaned, respondents' home would revert to its unsanitary condition and the children's hygiene would suffer. After showing progress during parenting time, respondents would fall back into old patterns of neglecting the children's educational, medical, and day-to-day needs when the children were returned to their care. Respondents also continued to abuse illegal substances, all the while denying their use. This pattern was repeated over and over. Respondents simply could not sustain any forward momentum. A parent cannot just participate in services; he or she must demonstrate benefit. *Trejo*, 462 Mich at 346 n 3; *In re BZ*, 264 Mich App 286, 300; 690 NW2d 505 (2004). The failure to benefit after more than four years of services supports that respondents would not be able to rectify these conditions within any reasonable timeframe to provide proper care and custody and a safe home for their children.

## IV. BEST INTERESTS

Respondents also challenge the circuit court's finding that termination of their parental rights was in the children's best interests. "Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012), citing MCL 712A.19b(5). "[W]hether termination of parental rights is in the best interests of the child must be proven by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). We review the court's factual findings in this regard for clear error. *In re JK*, 468 Mich 202, 209; 661 NW2d 216 (2003).

When determining whether termination is in the best interests of the children, the focus is on the child, not the parent. *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016). Factors relevant to the best-interest determination include "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the

advantages of a foster home over the parent's home." *Olive/Metts*, 297 Mich App at 41-42 (citations omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014). "[T]he likelihood that the child could be returned to her parents' home within the foreseeable future, if at all," is also relevant. *In re Payne/Pumphrey/Fortson*, 311 Mich App 49, 64; 874 NW2d 205 (2015) (quotation marks and citation omitted). Moreover, the court must consider the situation of each child involved to determine if termination would be in his or her individual best interests. *White*, 303 Mich App at 715.

The evidence supports that termination of respondents' parental rights was in the younger children's best interests. Children require parents who can provide them with a safe, stable, and permanent home. The evidence overwhelmingly established that both respondents lacked the skills necessary to safely parent their children.

All three children were under the age of eight at the time of termination. They had been wards of the court for four years and had been in foster care for 34 months. The children had begun to ask about their future and with whom they would live. The uncertainty caused the children anxiety and confusion. They started acting out after parenting-time sessions. At the time of termination, the children required counseling and music therapy to assist them in developing coping skills. As respondents had already failed to follow through with home-based therapy for MT1, they likely would abandon services to address the younger children's needs as well. Ultimately, termination of respondents' parental rights was the only avenue by which the children could achieve the stability and permanency they required.

Moreover, the children were thriving in their foster home. Although the children clearly had a bond with respondents, the foster parent had been the only stable force in the children's lives for years. The foster parent expressed a desire to adopt all three children. Termination of respondents' parental rights was the best opportunity for the siblings to remain together and continue overcoming their trauma.

We affirm.

/s/ Elizabeth L. Gleicher
/s/ David H. Sawyer
/s/ Kristina Robinson Garrett